Azua-Rinconada, and Ms. Hayes, whenever you're ready, we'll hear from you. Good morning. May it please the Court, I'm Anne Hayes, and I represent the appellate in this case, Ismael Azua-Rinconada, whom I'll refer to as Mr. Azua. On a January morning in 2016, a team of six law enforcement officers arrived at a single-wide trailer in an impoverished neighborhood in rural North Carolina. Mr. Azua shared the home with five family members. This stop by the officers was one of a series of stops that they intended to make during the course of the day. Although the officers called their visit to the home a knock-and-talk encounter, and they admitted in court that they had neither warrant nor probable cause to enter the house, they decided at some point that they were not going to leave the home without gaining entry. They would not let their lack of legal entitlement deter them. After knocking on the door a few times and getting no response, the officers utilized a pair of ruses in order to try to gain entry. First, an officer said in English, publisher's clearinghouse. When that didn't succeed, the officers gained entry to the home by using a ruse that had worked reliably for them in the past. They threatened to knock the door down. The threat worked. The evidence gained by the illegal entry provided the basis for Mr. Azua's prosecution and conviction. The officers' entry to the house without a warrant, without probable cause, violated the Fourth Amendment right against warrantless entry. Yes, Your Honor. They did those things or said those things to get the door to be opened. They'd heard people behind the door, and the door wasn't being opened. Yes. So the door was finally opened by the woman, and at that point, they asked whether they could come in because it was cold out. Isn't that right? Yes, Your Honor. And the woman said, yes, you can come in. And then as they were coming in, she said it a second time, yes, you can come in, and had her hand like this to come in. She could have talked to them at the door, and they started talking to her at the door, explained why they were there, this was a search and so forth, or talk or questioning. And they did ask if they could come in, and she said yes, come on in. Now, isn't that quite distinct from the effort to get the door to be opened as opposed to the entry into the home, which they asked to do? They apparently recognized that just because the door was open, they couldn't barge in. So they asked her if they could come in, and she said yes. Well, I want to address the facts specific to this case and a case that I think governs this situation. First of all, when they claimed that they were going to break the door down in order to get in, and the occupants knew that these people were police officers, that constituted a claim of lawful authority to enter that home. And Ms. Powell opened the door in submission to that claim. A reasonable person would not think that someone who is willing to knock the door down. Let's, let's, let's. Yes, sir. She opened the door. Let's concede what you're saying, that she opened the door because she believed she had to open the door. Yes. Okay. Now, at that point, the officers explain their purpose for being there, and then they say it's cold out here, can we come in? And she said, okay, you can come in. And then she said it a second time, okay, you can come in, and she pulled the door back further and put her hand, just her hand, in toward the room. Your Honor, I think. It seemed to me that at that point where she opened the door and they explained what they were doing, she could have continued talking to them and not invited them in and said, I prefer you not to come in. And I think the ruse was to get the door open, not to get into the house. And you sort of collapsed the two because the officers clearly recognized they couldn't, just because the door was open, they couldn't go in. But, Your Honor, the focus here cannot be on the subjective intent or expectation of the officers. No, I'm talking about what she manifested. In other words, she opened the door and she said she thought she had to, although the defendant said he recognized he didn't have to. He recognized they weren't going to break it down. He also recognized that he didn't have to answer the questions. He answered all those things during his examination, answered all those questions. But my only question to you is you make a lot about the ruse to open the door, but the officers clearly recognized that that did not entitle them to get into the trailer and did not use that ruse to get into the trailer. They just got, they got to use that ruse to get to talk to her. Now she's at the door talking to them and they have this interchange, which is a pretty low-key interchange. They're all very professional and quiet and she was gracious. And they said why they were there and they said it's cold out here, can we come in and talk to you? She said, sure, come in. And again, Your Honor, the focus needs to be an objective standard. It needs to be what a reasonable person would believe under these circumstances. And I submit that when an officer says to you, I'm going to knock the door down, no reasonable person would think then that that officer ---- She opened the door. She opened the door. Yes, Your Honor. Okay, take it from that point. Now what happens? The officers clearly did not feel entitled to enter by reason of that. They did not gain entry by reason of that. They got the door open. Now the question is, explain to me what happened in that interchange where she was exercising the discretion as to whether to come in or not. They didn't threaten her. They didn't say she had to. They said we're here to talk a little bit about security in the neighborhood and it was cold, I think it was January, whatever, and they said it's cold out here. She said, oh, come on in. Your Honor, this case is governed by the Supreme Court's decision in bumper versus ---- Stick with the facts. Just tell me. Yes, Your Honor. Is that accurate? It's accurate that when the door opened, they engaged Ms. Powell in conversation. What did they say? They didn't say we're entitled to come in or we're searching. They came and said we're doing a security check or whatever, the walk and talk language. How many people are in the house? I don't believe you when you say you're the only one. I think there are more people here and it's cold out here. Can we come in? But, Your Honor, I ---- I'm sorry. Go ahead, please. Oh, no, Judge, go ahead. Ms. Hayes, my question is it sounds like you're saying that the coercive effect of the statement we're going to knock your door down can never be dissipated once that statement has been made. And I believe that's ---- Is that your position? That is my position, Your Honor. At least the facts in this case did not dissipate that threat. The officers at that point said we are in command of what happens in this house. We can do what we're going to do. And in any event, that's what a reasonable person would take. Well, let's look at the evidence on that. She opened the door because the defendant said she could, right? Yes. She asked him. And the defendant said go ahead and open the door. So she opened the door. And then the defendant testifies, and he says, did you believe that they were going to take the door down? Answer, no. He explained all of these things as to how he ---- what he was thinking and what was their reactions. And he didn't feel coerced at all. He said they were the police, though. Your Honor, I disagree that he did not feel coerced. I think that he, as any reasonable person would in that situation, even if he didn't think that door was going to come down, I think he reasonably believed they were not going to leave without entering that house. Any reasonable person would think that under these circumstances. He says, I told her, Mrs. Powell, I told her to go there after they were identified as officers. As I said before, as I said before, if I had seen that they were not officers, I would have gone there or allowed them to knock the door down or to keep on knocking. Eventually they would get tired. But you heard her testify according to the statement they were scared to testify and so forth. And he said he didn't give that any ---- the fact that they were going to knock it down didn't give it any thought. So the question that was ---- you were just asked about whether it was dissipated. He never believed that that played into the entry into the house. He let them into the house because they were not some unidentified person, but rather were police officers. Your Honor, I understand your point. But I need to go back to the fact that even if he didn't think that at all, and I don't acknowledge that, but even if he didn't ---- Well, I just read in the testimony that ---- I understand, Your Honor. But even if Mr. Ossawa thought they'll go away if I ignore them, a reasonable person would not think that. And the ---- So you're saying it's ---- Consent has to be the ---- You know what bothers me about this case, Ms. Hayes? I read the briefs before I looked at the tape, okay? I read the briefs and I thought, oh, my God, this is outrageous. You know, you're just on a fishing expedition and you're threatening to knock somebody's store down. And then I looked at the tape and it was like there was almost a total disconnect between what the officer said, we're going to knock the door down, and then once the door was open, Ms. Powell was engaging in a conversational tone. There was nothing, you know, excited about it. There was ---- The whole scene was very conversational is the best way I can put it. So how do we ---- And you're just saying that's irrelevant because once the threat was made, it can never, never be affected no matter how factually things evolve to be just a conversation between the person and the police. I think a reasonable person being told that they were going to be subjected to having their door beaten down by police officers would make every attempt to be very acquiescent once that door opened. They would try to behave the way ---- They testified she did not open the door as a result of that threat. She opened that door because the defendant told her to open the door. And the defendant told her to open the door said he had thought earlier they were not officers because only one of them had the word police on it. When they saw that, they agreed to open the door. Now, that's a different scenario than you just explained. And the timing, though, in my view, the timing establishes that their announcement that they were going to break down the door, which happened just before Mr. Oswa instructed her to open the door, in my mind, that timing compels the inference that that statement caused Mr. Oswa to tell her to open the door. And Mr. Oswa was ---- We have actual evidence of why the door was opened and who opened it. Both Ms. Powell and the defendant explained she did not open the door. She asked Powell, I mean, she asked the defendant. And the defendant said, go open the door because they're officers. I had thought they were not officers. And that's the testimony. That's undisputed. And it's the combination of them being officers and making that threat. But, Your Honors, I do want to point to Bumper v. North Carolina, a Supreme Court case from 1968 where officers approached the house of the defendant and their grandmother met him at the door. And the officer said, I have a search warrant. I have a warrant to search your house. There was no animosity. There was no shouting.  And the grandmother said, go ahead. And she opened the door. There were no physical threats, no verbal threats. They said that they had authority to enter the house, and they did. There's another case that this Court decided ---- That's totally different. These people didn't ---- These officers did not assert they had entitlement to come into the house. They didn't threaten. They didn't even say, we want to come in. After the door was opened, they engaged her with a few conversations. Are you the only one here? Yes. And then she reversed that. And they're asking a few questions and then say, can we come in? And she said, yes. They didn't say we have a warrant. And I would direct the Court's attention to a decision by this Court, United States v. Mowat from 2008, where officers responded to a complaint about loud music at someone's home. They went to the door. The officer demanded that the door be opened, demanded that the door be opened. When the door finally was opened to crack, the Court said the fact that that door was opened to crack constituted a search and it was an illegal search because it was opened only on the demand of the police officer who did not have a warrant and did not claim to have a warrant. And so that case also compels the decision that this search was not consensual in this case. The Court says ---- The evidence there was what they saw through that crack, right? They obtained that evidence through their demand. Here, the only question is whether the entry into the house was demanded. But the entry to the house was absolutely dependent on this improper behavior of demanding that the door enter. And the opening of that door is a violation. Excuse me? Why do you keep asserting that when the evidence is to the contrary? I'm sorry, sir? I don't understand why you keep asserting that the door was opened because they threatened to tear it down. The door was threatened after they threatened to tear it down, and a reasonable person would ---- I understand. But you have said they opened the door because they ---- it was threatened to tear it down. And that's not what the evidence shows. I'm sorry, Your Honor. The door was opened after there was a threat to tear it down, and a reasonable person would have opened the door at that point in a response to lawful ---- We have the actual facts, don't we? But the actual facts, again, no matter what the subjective views were of the people you must ---- This is subjective. This is not what he thought. This is what he said and did. He told her to open the door because they're officers. And he told her he didn't know they were officers. He had assumed they were just people. They were dressed. They were not dressed in uniforms. And I understand, Your Honor, that what you're ---- the rule that you're stating is that no matter how bad the behavior, if the suspect is not flummoxed by it, it's not a violation. And I disagree. I think that the law is clear that if a reasonable person were distressed by that ---- There's a big difference here, though, that the officers, it wasn't like they were shouting. You know, I was struck when I watched the tape, you know, because I thought this is a no-brainer when I read the brief. And then when I watched the tape, I really became conflicted because the officers weren't screaming. They weren't doing multiple poundings, that kind of thing. It was ---- they were just saying. They were making this comment. And that's why I'm wondering that even if it was coercive, couldn't this, the coercive effect have dissipated as evidenced by their reaction, Ms. Powell's reaction and the nature of how she, you know, essentially ---- I see my time is up. May I answer? Yes. Dissipation, the government has not argued any sort of a dissipation theory in this case. But it's important to note that when you talk about dissipation or attenuation, there are factors that should be considered. One is the amount of time that elapsed, 20 seconds at most elapsed, between the opening of the door and the entry. That is not enough time for any coercion to dissipate. The presence of intervening circumstances. In this case, nothing changed between the time the door opened and they entered. There were no intervening circumstances. Well, there was a conversation. But I don't think that ---- I looked at that tape. Yes, Your Honor. The whole tape. And then I looked at the beginning again, which you focused on mostly. And I looked at that two more times. And I kept looking for some actions or mannerisms or something that were coercive or that she reacted to. And basically, she opened the door and they had this low-level conversation. She was not under stress. She didn't show anything. She didn't show fear. They started off and say, are you the only one home? We heard some other people in here. And she said, yes. And then they said, you have some more people in here? She said, yes, there are other people in here. And they explained what they were doing there. And they said, it's cold out here. Can we come in? And she said, sure, in a genuine, not a fearful fashion, genuinely generous way. And then she said it a second time, of course you can come in. And so they walked in. Now, that entry, from my view, did not look coerced. It didn't even look like she was under fear. And then we get the facts. And then we learn that the reason she opened the door was not out of fear. The reason she opened the door was because the defendant told her to open the door. And she asked, should I open the door? And the defendant said, yes, open the door. It's police. And they let them in. And then the conversation within the house was as low-key as it could be. I mean, there was no thing, we suspect this, we suspect that. As a matter of fact, they were basically looking for, what, weapons or something? And they found out that weapons were registered. Yeah, they were there on a very, very stale informant's statement from six months earlier. Well, Your Honor, I see my time as well as your budget. I want you to understand that. The difficulty is we have this tape that really shows what happened here. And we can all describe it. And then we do have the defendant's testimony who is the subject in this case. And from his point of view, he didn't feel that the entry was coerced at all. It was his voluntary decision to tell Mrs. Powell to open the door and let him come in. And he also said further on that he knew he didn't have to answer any of those questions. And he felt he answered them voluntarily. These were all his answers in his testimony. But anyway, you've got some rebuttal time. Thank you, Your Honor. Why don't we hear Ms. Fritz? Good morning. May it please the Court, Christine Fritz representing the United States. Judge Keenan, I have to tell you that when I read Ms. Hayes' brief for the first time, I had the same reaction you did. I immediately thought a phrase like open the door or we're going to knock it down has absolutely no place at a knock and talk. And that is the office's position. And I can assure you that the case agent and his supervisor now know that this is not a ruse that we view as being appropriate in this context. The statement was and remains unacceptable, and it absolutely weighs against a finding of voluntary consent. But consent, just like custody, is to be determined from the totality of the circumstances. And the record in this case, and especially that body camera footage, support the District Court's factual findings, first, that Ms. Powell provided voluntary consent to the officer's entry into her residence, and second, that the defendant was not in custody. At a minimum, on this record and after reviewing the video, I don't believe it can be said that the District Court's view of the evidence is implausible. And that is the standard that has to be met here. This is a clearly erroneous standard, and this Court has to be convinced that the District Court's factual findings were implausible. And that's not possible to meet here. The magistrate judge heard testimony from all of the relevant parties, did a very thorough review of that testimony, as well as the video, which I think is some of the most compelling evidence and provides the foundation as to why the District Court reached the conclusions that it did. And the Court didn't discount that that statement was made. The Court recognized that that weighed against consent. They recognized other factors that weighed against consent, such as the absence of any warning that you don't need to let us in. And those were factors that weighed against consent. But on the whole, and under the totality of the circumstances, the remaining factors supported the determination that Ms. Powell consented to the entry of her home. The Court looked to things like the officers approaching the door of the residence in mid-morning, without any drawn weapons. They knocked repeatedly, without yelling or violent pounding on the door. That was the Court's factual finding, that there was no yelling or violent pounding on the door. The defendant directed Powell to open the door after recognizing the visitors as officers. Ms. Powell is an adult who is fully capable of communicating consent. Once Ms. Powell opened the door, the officers did not use hostile, accusatory, or threatening language. And they asked in a conversational tone for permission to enter. And they asked because it was cold outside. And then Ms. Powell freely and casually invited them in. Their entry into the home wasn't connected to this statement that had been previously made. The door opening was a result of the defendant saying that she should open the door because he was concerned about his immigration status. And the invitation into the home, honestly, was after this observation that it was cold. And when you watch the video, it's almost as if it was, I'm sorry, I'm being impolite, it's cold inside. Yes, okay, come in. Okay, come in. And then she gestured, she opened the door more widely. And I would suggest that the fact that she chose to engage the officers in conversation upon opening the door and have a dialogue with them also supports the finding of consent. That she wasn't under the impression that they were immediately allowed to come into her home. And the fact that they stood pretty still and calmly when she opened the door and talked with her in a conversational manner also supports that, in spite of that ill-advised statement, they knew that they were not going to enter that home without consent. And other factors to consider, Ms. Powell's characteristics, that she was educated. She was in a, she had a two-year degree. She was in a nursing program. Consider the setting. It was 930 in the morning. It was light out. She was not home alone. Although there were multiple officers at the scene, the defendant saw only the two officers who ascended the porch. And he recognized those as officers. And I think also the tone and the tenor of that exchange, it really was, watching the video really changed my image that I had created in my head of how this occurred. And I'm very relieved that the court has taken the time to review that video footage very closely. Because, again, that changed everything for me. And I'm not here to suggest that this was an appropriate statement in this context. We don't think it was. We're not happy that this statement was made. But at the end of the day, we did not see this as a constitutional violation. We believe that the district court got it right, applying the law to these facts. And given the high standard to show clear error, we simply don't think that the district court's view of the evidence is implausible. If the court has no further questions, I'll rest on the briefs. Thank you. Thank you. Ms. Hayes. Thank you, Your Honor. The very casualness of the constitutional violation of the conduct in this case, the very casualness with which the officers undertook to threaten to break this door down, is in itself troubling. It's part of a pattern that they use in this community. They acknowledge that, that this is part of the tools in their toolbox when they go to people's homes, is they threaten to break the door down. Why? Because it works. They do it because it works. They knew if they said it, the door would be opened. And, Your Honor, I understand that you're making a distinction between the door opening and them entering, but that is a distinction that I don't think applies because I don't think any reasonable person would think that someone who has threatened to break down your door will stand placidly on the other side of the threshold. The message that you'll be giving the police officers in this case, if you let this go, if you affirm the conviction, is make your threats in a low tone. Make your assertion of authority in a way that sounds conversational. If you can gain acquiescence without it looking like somebody felt threatened or afraid, that's okay. And it's not okay. It's not okay under bumper, and it's not okay under this Court's decision in Mowat. I ask that you reverse the conviction of Mr. Oswald. Thank you. Thank you. Ms. Hayes, I note you are court-appointed, and you've provided service to the court. It's so important, and I know you've done it quite a bit, and I think we very much appreciate it and want to acknowledge that. We'll come down and greet counsel. Do you want a break, or do you want to take a break? Break.
judges: Paul V. Niemeyer, Barbara Milano Keenan, Norman K. Moon